# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

**UNITED STATES OF AMERICA,**

v.                                              Case No.:  8:16-CR-00407-JDW-AEP

**ANTONIO ARROYO PANAMENO**
_____ :

## SENTENCING MEMORANDUM ON BEHALF OF ANTONIO ARROYO PANAMENO

### I.   Preliminary Statement

Mr. Arroyo Panameno files this sentencing memorandum asking that this Court consider granting a variance from the final guideline calculation calling for a sentence of between 135 and 168 months.  Mr. Arroyo Panameno humbly requests this court to consider the factors contemplated in 18 U.S.C. § 3553(a) and that it also consider recommendations within this memorandum and those requested orally at his sentencing.

### 18 U.S.C. § 3553(a) Variance Factors

*History and Characteristics of the Defendant*

Mr. Arroyo Panameno asks this court to consider his circumstances in his native Colombia as illustrated in his presentence report when it tailors a sentence for him.  Mr. Arroyo Panameno has lived a life of extreme poverty and struggle for as long as he can remember.  Born to a fisherman and homemaker, his conditions as a child were not much different than the conditions he lived with prior to his crimes.  Having no money or resources as a child, Mr. Arroyo Panameno was forced to quit school after third grade to help support his family.  Despite his father's income and Mr. Arroyo Panameno's, far too often the family had no money for necessities and it wasn't uncommon for Mr. Arroyo Panameno to go to bed hungry.  Absent for him was accessibility to beneficial social services found to many in more established countries or

more urban areas of Colombia. Bluntly, if the family didn't earn, they didn't eat and there was no hope of help from neighbors or the government as the plight there was similar. Mr. Arroyo's life is fraught with squalor and he has never lived with plumbing in his home to supply water for bathing or drinking. Common for Mr. Arroyo Panameno and his family was the need to catch rain water in an outside basin for drinking and cooking while an outside well was used for bathing. The idea of a plumbed home is but a pipedream for those in Mr. Arroyo Panameno's position.

Mr. Arroyo Panameno has no issues with substance abuse or alcohol and neither have affected his relationship with his nuclear or extended family. Emotionally and mentally he is healthy, but for the sadness he has for his crimes and how it affects his family. Mr. Arroyo Panameno leaves behind his living parents, three sisters, three brothers, a longtime girlfriend who he cohabitates with, their common child, and twins from a prior relationship. He is very active in the lives of his girlfriend and children, providing all he can for them and was their only source of support. Mr. Arroyo Panameno is close with his children and is devastated that he will miss the lion's share of their childhood. He longs to be there for them and blames only himself for his misgivings leading to his situation.

Mr. Arroyo Panameno, unlike those intimately involved in the drug trade, performed his deeds not out of greed but out of a feeling of necessity. In spite of this he was only to receive, assuming he actually got paid and completed his journey alive, $17,233.50. In fact, he was actually paid approximately $7,900 to accompany approximately $17,250,000 worth of cocaine on its voyage.[1] Stated differently, Mr. Arroyo was paid just .000426% of the cocaine's value.

---

[1] Using a recent article from Business Insider it is estimated that a kilogram of cocaine, once it gets from Colombian traffickers to those who would then distribute to the United States is worth between $10,000 and $20,000. I have split the difference and estimated that each kilogram of

Frankly, this is a lifetime's work for someone in Mr. Arroyo Panameno's condition. The hope for escaping poverty's heavy hand and finally being able to provide not only food, shelter, and water to his family but also medical care, God forbid tragedy occurs, was simply overwhelming for Mr. Arroyo Panameno. We are dealing with a man, while not a unique situation, who has for a lifetime lacked basic necessities enjoyed by even the poorest of individuals in the United States. No welfare, no realistic chance to educate himself and advance, and no ability to even access the care of an emergency room has ever been present for Mr. Arroyo Panameno. The blinding prospect of changing this for his children caused him to run a fool's errand and he will pay dearly for it, even if he is sentenced to the statutory minimum mandatory.

If nothing else, the sum of $7900 earned for risking his life by drowning, dehydration, or murder, illustrates the great desperation felt by Mr. Arroyo Panameno and his co-conspirators. For most Americans, who at the least have access to medical care through anti patient dumping statutes, and food through shelters, there isn't enough money to take the risks taken by Mr. Arroyo Panameno. The hope for a better life fueled Mr. Arroyo Panameno's actions. Considering for himself the actions taken, he regrets what he has done and knows that he must atone for his crimes. Mr. Arroyo Panameno has accepted responsibility for his deeds and makes no excuses for his conduct. However, he respectfully prays for the mercy of this Court and asks for a variance of his sentence to 120 months of incarceration, the least amount of time possible given his crime.

***The need for the sentence imposed to reflect the seriousness of the offense, provide adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant.***

Mr. Arroyo Panameno is 28 years old at the time of drafting of this memorandum. He is

---

cocaine aboard the vessel interdicted in this case was worth $15,000. Had a valuation been used considering the value after a dealer divides the kilogram, the value would be higher.

faced with the likelihood that at best he will receive ten years in the Federal Bureau of Prisons, possibly more should this Court sentence him within the recommended guidelines. It is arguable that even a ten-year sentence for a 28-year-old man with no known criminal history, and the reality of deportation upon completion of his sentence, reflects the seriousness of this kind of offense, provides adequate deterrence to criminal conduct, and will protect the public from further crimes of Mr. Arroyo Panameno in that he will never be released back into the population of the United States.

Numerous studies have found that a lengthier prison sentence does not reduce the risk that an individual will recidivate. Because "[t]here is generally no significant association between perceptions of punishment levels and actual levels … implying that increases in punishment levels do not routinely reduce crime through general deterrence mechanisms," a longer than necessary sentence would not achieve the goal of crime deterrence. Gary Kleck, et al, *The Missing Link in General Deterrence Theory,* 43 Criminology 623 (2005). While argument could be made that if this Honorable Court sentences Mr. Arroyo Panameno below the guideline recommendation, others considering similar crimes might be more apt to carry them out after seeing a lighter sentence imposed, crime deterrence studies simply don't support that notion. Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." *Id*.; *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far

better deterrent than its severity."). Typical of the findings on general deterrence are those of the Institute of Criminology at Cambridge University. *See* Andrew von Hirsch *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999), summary available at http://members.lycos.co.uk/lawnet/SENTENCE.PDF. The report, which was commissioned by the British Home Office, examined penalties in the United States as well as many European countries. *Id*. at 1. The report examined the effects of changes to both the certainty and severity of punishment. *Id*. While there was significant correlation between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance." *Id.* at 2. The report concluded that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." *Id*. at 1. According to "the best available evidence, . . . prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen *et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011). In sum, statistical evidence shows that a longer sentence for Mr. Arroyo Panameno or those similarly situated will not act to better prevent reoffending, a near guarantee of getting caught will. The annual cost of incarceration as indicated from the Administrative Office of the United States Courts on June 24, 2016, is $31,976 per year. PSR ¶ 67. If this Court would sentence Mr. Arroyo Panameno to the minimum of ten years in prison, $39,970 would be saved and based upon the above referenced studies, an increased chance of recidivism is statistically unlikely.

***The need to avoid unwarranted sentencing disparities amongst similarly situated defendants.***

Mr. Arroyo Panameno is not a United States citizen and as such will be immediately deported from the United States upon his release from the Federal Bureau of Prisons. Due to his status, he will be treated in a disparate fashion by the Bureau of Prisons from those who are

citizens of the United States with similar records and crimes. Because Mr. Arroyo Panameno is not a United States citizen he will be ineligible for early halfway house release upon the twilight of his sentence, and he would be unable to apply for RDAP treatment were he to have issues with substance abuse. https://www.fd.org/docs/select-topics---bop/fed_bop_merchant.pdf. No longer is it likely that Mr. Arroyo Panameno could see his sentence shortened by early deportation proceedings, akin to US citizens being released early after completion of RDAP or placement in a halfway house. *Id.* Effectively, the bureau of prisons has taken away the likelihood that Mr. Arroyo Panameno will be eligible for valuable benefits he would otherwise be eligible for had he been a United States citizen and this in and of itself causes any sentence received by him to be disparate from one in the exact same scenario but for citizenship.

    Mr. Arroyo Panameno has indicated on more than one occasion that his primary desire when his prison facility is recommended is the ability to work in a vocational program like UNICOR so that he may, hopefully, send money to his family in Colombia. He would like to learn English and has indicated a desire to participate in faith based programs. According to the Federal Bureau of Prisons Directory of National Programs, he may not be able to participate in the programs he would like, simply because he is a deportable alien. https://www.bop.gov/inmates/custody_and_care/docs/BOPNationalProgramCatalog.pdf
One program that would most certainly aid Mr. Arroyo Panameno upon his release from prison is the "Occupational Education Program." Within this program, Mr. Arroyo Panameno would be taught "marketable skills in a wide variety of trades" varying by institution. *Id.* The problem presented for Mr. Arroyo Panameno is that because he will be under an order of deportation, he will only be able to participate in this program "if institution resources permit after meeting the needs of other eligible inmates." *Id.* Mr. Arroyo Panameno will not be able to participate in a

Life Connections Program because of the written deportation order that will follow him. *Id.* Like the Occupational Education Program, this program would benefit Mr. Arroyo Panameno in that it would aid in the development and maturation of Mr. Arroyo Panameno. The teachings of the Life Connections Program help inmates transition back into society with the hope of helping them avoid situations that caused them to offend in the first place.

Mr. Arroyo Panameno submits that it is unfair that an identically situated defendant, sentenced to the same sentence for the same crime, can receive harsher treatment in the bureau of prisons and be restricted from beneficial, rehabilitative programs, simply because he or she is born outside of the United States. The disparities faced by Mr. Arroyo Panameno are actual punishments which can be considered at sentencing. See *United States v. Navarro-Diaz*, 420 F.3d 581, 588 (6th Cir. 2005) (illegal reentry case where Court noted defendant would be punished more harshly due to ineligibility for six-month early release in halfway house and as such, used this as a basis to sentence at the low end of the guideline). Mr. Arroyo Panameno respectfully requests that this Court take into consideration the disparities he will face and vary downward from his recommended guideline sentence.

***To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner***

As mentioned in the preceding paragraph, Mr. Arroyo Panameno would like to earn an education while imprisoned and ultimately learn a trade so that he can make a legitimate living upon his return to Colombia. While his first step is earning his GED, he has indicated interest in becoming an electrician. To earn his electrical apprenticeship in any of FCI Miami, Marianna FCI, or Coleman FCC, Mr. Arroyo Panameno would first need his GED and 48 months to complete his education. Based upon his required sentence, this would easily be accomplished if

he is eligible as an illegal alien. *Inmate Occupational Directory*, U.S. Department of Justice Federal Bureau of Prisons.

## Requested Sentence

Mr. Arroyo Panameno respectfully requests that this Court grant a downward variance to the minimum mandatory prison term of 120 months, absent a substantial assistance motion. Because Mr. Arroyo Panameno would like to, if possible, work in a UNICOR program and learn English, he requests to be housed in FCI Miami, Marianna FCI, Coleman FCC, or another warm weather facility with a UNICOR program that allows illegal aliens to work.

WHEREFORE, Defendant requests that this Court take into consideration the aforementioned arguments and for other such relief that this Court deems just.

Respectfully submitted this 27th day of February, 2017.

/S/ Jason M. Mayberry
MAYBERRY LAW FIRM
Jason M. Mayberry
FBN- 36212
Attorney for the Defendant
3902 Henderson Blvd.
Suite 208-136
Tampa, FL 33629
Jason@mayberryfirm.com
Ph-813-444-7435
Fx-727-755-0098

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing has been furnished by CMECF to the Office of the United States Attorney, this 27th day of February, 2017.

*/S/ Jason M. Mayberry*
JASON M. MAYBERRY, Esq.